**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 1:23-cr-10186-ADB |
| KEYON ROBERSON, | |
| Defendant. | |

## DEFENDANT KEYON ROBERSON'S SENTENCING MEMORANDUM

Defendant Keyon Roberson, by and through his undersigned counsel, hereby submits the following Sentencing Memorandum in connection with the sentencing proceeding in this matter currently scheduled for Tuesday, July 22, 2025, at 10:00 a.m. As explained in greater detail below, Mr. Roberson respectfully submits that, after consideration of all the factors under 18 U.S.C. § 3553(a), a sentence of **60 months**, plus an additional three-year period of supervised release, would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

## MR. ROBERSON'S PERSONAL HISTORY

Mr. Roberson's personal background is summarized in the PSR. *See* PSR ¶¶ 121-150. Born in Boston, Massachusetts in 2000, he was raised by his mother and maternal grandmother; his father left the family shortly after his birth and died of a drug overdose in 2023. *Id.* ¶ 122. His family struggled financially and has always lived in areas plagued with violence and drug trafficking. *Id.* In fact, while living in these areas, Mr. Roberson was shot twice, first in 2015 and later in 2020. *Id.* ¶¶ 131, 133.

Throughout Mr. Roberson's life, he has struggled with anxiety, depression, and attention deficit hyperactivity disorder. PSR ¶ 134. These mental health issues were exacerbated when Mr. Roberson was sixteen, when his best friend, Gerrod Brown, was murdered while walking his dog. *Id.* ¶ 135. Mr. Roberson and Mr. Brown attended school together, and Mr. Brown was a positive influence on Mr. Roberson and motivated him to go to school every day. *Id.* ¶¶ 135, 139. Mr. Roberson took Mr. Brown's death very hard and lost the desire to go to school after Mr. Brown's death. *Id.* ¶¶ 135, 138-139. Afterwards, Mr. Roberson and his therapist had discussions about whether he might have post-traumatic stress disorder, but he did not receive a diagnosis. *Id.* ¶ 134.

Despite his family's difficult circumstances, Mr. Roberson remains very close with his mother, who has always been emotionally and financially supportive of him. *Id.* ¶ 122. Mr. Roberson is also close with his mother's ex-boyfriend, Jeremy Crockett, whom he considers to be a male role model who provided him with positive advice and treated him as a son. *Id.* ¶ 123. And he maintains close relationships with his siblings and half-siblings, Keyonda Roberson, Precious Valentine, and Journey Duponte. *Id.* ¶ 124. Prior to his incarceration, Mr. Roberson also helped care for his younger siblings, Kash and Ja'dore Crockett.

The collection of letters provided to the Court demonstrates the powerful love and support that Mr. Roberson's family offers and provide some insight into his character. *See* Ex. A-G. Mr. Roberson's mother describes him as "the glue" in their family, the person his siblings—both older and younger—look up to. Ex. A. His sister Keyanda talks about him as someone who has "always been there for me through thick and thin," Ex. B, and his sister Precious describes him as a "sweet and selfless person" who "puts his family first and always steps up to be the person that my siblings and I need," Ex. C. Other family members describe Mr. Roberson as a "a listener, a learner, a 'sponge,'" Ex. D; "a ray of light in our family," Ex. E; and someone with "a

warmth about him that made him a joy to be around," Ex. G. And all of them describe a man

who, despite his mistakes, "has expressed sincere regret and a strong desire to rebuild his life,"

*id.*, "is ready to make new beginnings," Ex. F, and is devoted to "to straitening up his actions,"

Ex. C.

The driving force behind Mr. Roberson's desire to turn his life around—a process that he

had already begun prior to his arrest in this case—is his commitment to supporting and being a

role model for his son. In 2018, Mr. Roberson began a relationship with Brielle Walker-James,

with whom he shares a four-year-old son, Khyaire. PSR ¶ 127. Although Mr. Roberson and Ms.

Walker-James have grown apart over the years, they have remained friends and, prior to his

incarceration, they co-parented their son. *Id.* ¶¶ 127-128. Mr. Roberson frequently helped care

for Khyaire, which allowed Ms. Walker-James to put more focus on working towards her

bachelor's degree in health management. *Id.* ¶ 128.

Mr. Roberson's family describes Khyaire's birth in 2021 as an important turning point in

Mr. Roberson's life. His mother explains that "it was when Kyhaire was born that I saw Keyon

change and begin to really focus on improving himself. He was determined to get a job so that he

could provide for his son, and he finally found a job that he loved and was passionate about." Ex.

A. Other family members describe Mr. Roberson as a father who "goes above and beyond for his

son," Ex. B; who is "committed to providing for his family, including his young son," Ex. D; and

whose "goal is to make his child's life better than [his] own," Ex. E. All of them believe that

"Keyon's desire to be a good father and role model for his son will continue to drive him to

better himself during and after his incarceration," Ex. A, and that he is "committed to improving

himself and being able to support his family as soon as he can," Ex. F. "What he seeks now is

structure, purpose, and redemption," Ex. G, and "he now understands that he does not need to be

defined by [his] environment and should strive for more, not only for himself but to be a role model for his son," Ex. C.

Indeed, before his arrest in this case, Mr. Roberson was already well on his way to being a contributing member of society. In 2022, Mr. Roberson began working at Planet Fitness, where, according to his manager, Kellina Abrahams, "he quickly proved to be one of the most dependable and hardworking employees on my team." Ex. G. Ms. Abrahams states that Mr. Roberson "consistently went above and beyond for our members and fellow staff," that he "often volunteered to cover shifts, even at other locations, and was always willing to handle tasks that others avoided, including difficult maintenance issues in the locker rooms," and that he "brought joy, positivity, and humor to the workplace and was truly loved by both members and the team." *Id.* She describes him as " a young man doing everything he can to build a better future" and "who strives to grow, stay grounded, and learn from life's challenges." *Id.* Since his detention in this case, Mr. Roberson has been actively working towards setting himself up for a better future following his release, including by taking steps to obtain his GED. PSR ¶ 138. He also intends to seek mental health treatment after he has been sentenced.

Mr. Roberson's mother, grandmother, sisters, aunts, uncle, and even former employer have all written to this Court describing a man they know to be kind, reliable, ambitious, and genuinely remorseful for his actions. *See* Ex. A-H. They show that Mr. Roberson has enormous support in the community, which will be critical to his continued success, and they all express confidence that, after his eventual release, Mr. Roberson will be able to rebuild his life and continue to be a productive member of society. *Id.* With all this support from his community, as well as the support of the Probation Office during his period of supervised release, Mr. Roberson

is well-positioned to successfully begin the process of re-integrating into society and becoming a productive and responsible citizen.

## **THE OFFENSE CONDUCT**

Mr. Roberson has pleaded guilty to participating in the charged conspiracy to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). *Id.* ¶ 2. As detailed in the PSR, the overall conspiracy involving the so-called "Heath Street Gang" began in the 1980s—long before Mr. Roberson was born—and has allegedly involved a wide variety of crimes over many years. *Id.* ¶ 11. While the government has provided extensive descriptions of activities conducted by other members of the Heath Street Gang, Mr. Roberson's participation in the conspiracy was relatively limited in scope. Specifically, Mr. Roberson acknowledges his association with the Heath Street Gang and his involvement in some drug dealing, *id.* ¶ 35, credit card fraud, *id.* ¶ 58, and fraud related to certain pandemic unemployment assistance, *id.* ¶¶ 59-62.

Regarding the more serious allegations set forth in the PSR, however—an alleged "conspiracy to commit murder" in December 2019, *see id*. ¶¶ 36-44, and an alleged "attempted murder" in May 2022, *see id.* ¶ 45-57—Mr. Roberson disputes that there is sufficient evidence to hold him accountable for either of those underlying offenses. Specifically, Mr. Roberson contends that the government has not established his responsibility for either of those offenses and that they therefore should not be included in any guideline calculations in this case. Moreover, even if the Court were to conclude that there is sufficient evidence to hold Mr. Roberson accountable for *some offense* on one or both of those dates, he contends that the evidence presented by the government and described in the PSR describes, at most, his potential involvement in conspiracies to commit assaults, not murders.

## PROCEDURAL HISTORY

On February 7, 2024, Mr. Roberson was charged in count 5 of a superseding indictment with conspiracy to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). *See* Superseding Indictment, ECF No. 57. Mr. Roberson was arrested on those charges on February 14, 2024, and he has remained in federal custody at Wyatt Detention Center in Central Falls, RI ever since. *See* PSR ¶ 1.

On April 10, 2025, Mr. Roberson pleaded guilty to count 5 of the superseding indictment. *Id.* ¶ 2. The plea agreement is pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and includes, inter alia, an agreed-upon sentence that includes a term of incarceration between 60 and 108 months. *See* Plea Agreement, ECF No. 316; PSR ¶¶ 3-4. The plea agreement specifically reserves Mr. Roberson's right to challenge the government's proposed guideline calculations. *See* Plea Agreement, ECF No. 316.

Mr. Roberson's sentencing is currently scheduled for Tuesday, July 22, 2025, at 10:00 a.m.

## THE SENTENCING GUIDELINES

### A.    The PSR's Calculations of the Sentencing Guidelines.

The Probation Office calculates Mr. Roberson's offense level by using U.S.S.G. § 2E1.1, the guideline applicable to offenses involving unlawful conduct relating to racketeer influenced and corrupt organizations. *See* PSR ¶ 68. Under § 2E1.1, Mr. Roberson's base offense level is the greater of 19 or the offense level applicable to the underlying racketeering activity. *Id.*

In the PSR, the Probation Office concludes that the underlying racketeering activities consist of two acts of conspiracy to commit murder on December 6-7, 2019 (Count 5sA), and May 11, 2022 (Count 5sB), one act of possession with intent to distribute a controlled substance on February 11, 2023 (Count 5sC), one act of bank fraud (Count 5sD), and one act of wire fraud

on May 17, 2020 (Count 5sE). *Id.* ¶ 69. Relying on those conclusions, the Probation Office finds

that the base offense level is **33** for Counts 5sA and 5sB; **12** for Count 5sC; and **6** for Counts

5sD-E: (Count Group 1). *Id.* ¶¶ 73, 79, 85, 91. To Count Group 1, the Probation Office has added

6 points where the loss from the bank and wire fraud was more than $40,000 but less than

$95,000, for an adjusted offense level of **12**. *Id.* ¶ 92.

Using **33** as the greater of the adjusted offense levels, the Probation Office then calculates

the combined adjusted offense level as 35, after adding 2 points pursuant to U.S.S.G. § 3D1.4.

*Id.* ¶ 100. After a three-point reduction for acceptance of responsibility, the Probation Office

concludes that Mr. Roberson's final total offense level is **32**. *Id.* ¶¶ 101-102, 104. With a

criminal history category of **II**, *id.* ¶¶ 110, that calculation results in a proposed guideline

imprisonment range of **135 to 168 months**, *id.* ¶ 152.

    **B.**    **Mr. Roberson's Objections to the PSR's Guideline Calculations.**

As noted above and as set forth in his objections to the PSR, Mr. Roberson disputes that

he should be held responsible for a "conspiracy to commit murder" on December 6-7, 2019 or an

"attempted murder" on May 11, 2022. *See* PSR, Defendant's Objections #6-14. Rather, he

contends that he is responsible only for possession with intent to distribute a controlled substance

(Count 5sC), one act of bank fraud (Count 5sD), and one act of wire fraud (Count 5sE). *Id.*

Because the offense levels for these underlying racketeering activities are less than the specified

minimum level of 19, he accordingly contends that his adjusted offense level should be **19**, not

**33**, and that his combined adjusted offense level should therefore be **21**, not **35**. *See* PSR,

Defendant's Objections #20-22. With a three-point reduction for acceptance of responsibility,

Mr. Roberson thus contends that his total offense level is **18**. See PSR, Defendant's Objections

#23. With a criminal history category of II, that calculation would result in a guideline

imprisonment range of **30 to 37 months**. *See* PSR, Defendant's Objections #24.

C.    <u>The Alternative Guidelines Calculations under the "Aggravated Assault"
      Guidelines.</u>

Moreover, as explained in greater detail below, even if Mr. Roberson *could* be held

responsible for offenses arising from the events of December 6-7, 2019, and May 11, 2022, the

evidence surrounding those events amounts, at most, to offenses involving alleged conspiracies

to commit "aggravated assaults," rather than conspiracies to commit murder, which require proof

of a heightened specific intent, a factor that is not present here. *See infra* (*citing Commonwealth*

*v. Judge*, 420 Mass 433, 441 (1995); *Commonwealth v. Cantres*, 405 Mass. 238, 244 (1989); 18

U.S.C. § 1111). Under this approach, the Court should calculate Mr. Roberson's guidelines for

those two events with reference to U.S.S.G. § 2X1.1 and § 2A2.2, rather than under U.S.S.G.

§ 2A1.5. *See infra*.

Accordingly, even if the Court concludes that there is sufficient evidence to hold Mr.

Roberson responsible for those two events, the base offense level for each of those offenses

would be **14**, with upward adjustments of (at most) **7**[1] for the December 6-7, 2019 incident and

**12**[2] for the May 11, 2022 incident. *See* U.S.S.G. § 2X1.1(a); U.S.S.G. § 2A2.2 (a-c).  After

grouping the four separate counts pursuant to U.S.S.G. § 3D1.4, Mr. Roberson would have a

combined adjusted offense level of **27**.  After a three-point reduction for his acceptance of

---

[1] This calculation assumes that the Court finds that it can be established "with reasonable
certainty" *both* that the alleged assault on December 6-7, 2019 involved "more than minimal
planning" **(+2)**, *see* U.S.S.G. § 2A2.2(b)(1), *and* that the conspirators intended to discharge a
firearm **(+5)**, *see* U.S.S.G. § 2A2.2(b)(2)(A). Mr. Roberson disputes that that there is sufficient
evidence to support either enhancement.

[2] This calculation assumes that the Court finds sufficient evidence to conclude that the planned
assault on May 11, 2022 involved "more than minimal planning" **(+2)**, *see* U.S.S.G.
§ 2A2.2(b)(1), that the conspirators intended to discharge a firearm **(+5)**, *see* U.S.S.G.
§ 2A2.2(b)(2)(A), *and* that the alleged victim sustained "serious bodily injury" **(+5)**, *see*
U.S.S.G. § 2A1.2(b)(3). Again, Mr. Roberson disputes that that there is sufficient evidence to
support either enhancement.

responsibility, Mr. Roberson's final total offense level under this alternative approach would be **24**. With a criminal history category of II, that alternative calculation would result in a guideline imprisonment range for Mr. Roberson of **57-71 months**. *See* U.S.S.G. Ch. 5, Part A.

## ARGUMENT

### A.    The Court Should Not Find Mr. Roberson Responsible for Conspiracy to Commit Murder or Attempted Murder.

The PSR determines that an alleged "conspiracy to commit murder" on December 6-7, 2019, and an alleged "attempted murder" on May 11, 2022, constitute relevant conduct for Mr. Roberson under the guidelines. *See* PSR ¶¶ 36-57, 69. The Court must find such relevant conduct by a preponderance of the evidence. *See United States v. Sandoval*, 6 F.4th 63, 104 (1st Cir. 2021). The evidence cited in the PSR, however, fails to establish that Mr. Roberson should be deemed responsible for either of these serious offenses by a preponderance of the evidence.

### 1.    *The Alleged "Conspiracy to Commit Murder" on December 6-7, 2019.*

To establish a conspiracy under Massachusetts law, the government "must prove that the defendant combined with another 'with the intention'" to "commit the object crime"—here, murder. *Commonwealth v. Frazier*, 410 Mass. 235, 245 (1991) (quoting *Cantres*, 405 Mass. at 244). The PSR concludes that Mr. Roberson conspired to commit murder in the first degree. *See* PSR ¶ 73; *see also id.* at p.46 (Probation Officer's Response to Defendant's Objection #6). Under Massachusetts law, murder in the first degree requires proof that the defendant acted with "deliberate premeditation"—that is the defendant acted with the specific intent "that his actions will cause death and that he acted with sufficient time (even if fleeting) to reflect on that consequence." *See Judge*, 420 Mass. at 441; *see also Model Jury Instructions on Homicide*, "IV. Murder in the first degree," *available at* https://www.mass.gov/info-details/model-jury-instructions-on-homicide-iv-murder-in-the-first-degree. Federal law embraces a similar intent

standard, describing "murder" as "the unlawful killing of a human being *with malice aforethought.*" *See* 18 U.S.C. § 1111.

Here, the evidence set forth in the PSR falls well short of establishing that Mr. Roberson participated in an alleged conspiracy to commit murder on December 6-7, 2019. To be sure, the PSR cites evidence that, on the two-year anniversary of the murder of a Heath Street gang member, Mr. Roberson was riding in a car that was involved in a high-speed chase and a subsequent crash near a rival gang's territory. *See* PSR ¶¶ 36-40.[3] The PSR also cites evidence indicating that two of the other individuals in the car possessed firearms. *Id.* ¶¶ 38-39 (describing one individual who was arrested with a firearm on his person and another individual who "appeared to grab something from the backseat area" where a firearm was later recovered).  But the PSR does not establish that Mr. Roberson ever personally possessed any firearms at the time of that crash—only citing evidence that Mr. Roberson had been "in the backseat of the car," the area where a firearm was eventually recovered. PSR ¶ 40.  Most importantly, the PSR contains no evidence describing where the three individuals in the car were headed or what, if anything, they were planning to do.

As an initial matter, Mr. Roberson notes that the various firearms-related possession charges that were lodged against him in connection with this event were all subsequently dismissed. *See* PSR ¶ 119. That result is hardly surprising given the lack of evidence that he ever possessed any firearm or ammunition in connection with this event. *See* PSR ¶¶ 37-40. But even if a firearm possession charge against Mr. Roberson could plausibly be supported here by a preponderance of the evidence from December 6-7, 2019, the evidence in no way establishes that

---

[3] December 6, 2019, was "associated with the two year anniversary of the murder of a Heath Street Gang member by the Mission Hill gang." PSR ¶ 36.

he participated in a "conspiracy to commit murder" on that date.  Indeed, the evidence cited in the PSR in no way establishes the existence of any conspiratorial agreement between Mr. Roberson and any other persons, let alone the mental state required to establish a conspiracy to commit murder. *See United States v. Marino*, 277 F. 3d 11, 30 (1st Cir. 2002) ("A conspiratorial agreement is the key to the existence of a conspiracy"). Nor does this evidence come close to establishing that the object of the alleged conspiracy, assuming one ever existed, was *murder* as opposed to some other form of wrongful conduct (e.g., assault, possession of firearms, or certain reckless driving offenses).[4] Certainly, the evidence cited in the PSR establishes Mr. Roberson's presence at the scene of the December 7, 2019 car crash. But that fact is wholly inadequate to hold Mr. Roberson responsible for participating in a conspiracy to commit murder on that date. *See id.*

Nor is the PSR's conclusion regarding the December 6-7, 2019 incident helped by its reference to a recorded phone call—made more than six weeks later—between Mr. Roberson and an individual identified in the PSR as "Martin." PSR ¶ 41. While the government's summary of this phone call seeks to characterize the call as involving Roberson being "admonished by a more senior Heath Street Gang member/associate for acting recklessly *in attempting to murder rival gang members* and being caught by the police," *id.* ¶ 41 (emphasis added), the actual transcript of the call does not support that characterization—particularly the reference to an "attempted murder." The call contains no specific reference to the car crash or the specific events of December 6-7, 2019, and contains absolutely no reference to any attempted murder. *Id.*  At

---

[4]As discussed below, the relevant guideline provisions for assaultive conduct involve base offense levels that are far lower than the base offense level of **33** that is applicable to "conspiracy to commit murder" or "attempted murder." *See* U.S.S.G. § 2A2.3 (Assault, Base Offense Level of 7 if a firearm was possessed); U.S.S.G. § 2A2.2 (Aggravated Assault, Base Offense Level of 14, with a 3-level increase if a firearm "was brandished or its use was threatened").

best, it contains several oblique references to the anniversary of a prior shooting ("you knew what day it was"), and the two participants on the call repeatedly express their love and support for each other. *Id.* The call simply does not support a conclusion that Mr. Roberson was somehow involved in a conspiracy "to commit murder" on that date.

Nor is the PSR's conclusion bolstered by its references to three additional recorded phone calls in which Mr. Roberson was not involved. *Id.* ¶¶ 42-44. In those calls, other alleged Heath Street gang members appear to discuss the fact that Mr. Roberson has never in fact committed a violent crime on behalf of the gang. *See id.* ¶ 42 ("He's up here acting like he's some type of dog"); *id.* ¶ 43 ("Nothin bro . . . this n**** [Mr. Roberson] ain't never touched nothin bro"); *id.* ¶ 44 ("I told him bro like you don't do nothing bro but make a bunch of noise"). Indeed, the participants on these three telephone calls focus primarily on Mr. Roberson's apparent propensity "to talk a big game" while *not actually committing any violent offense.* Moreover, none of these calls reference the events of December 6-7, 2019, much less suggests that Mr. Roberson was engaged in a "conspiracy to commit murder" on that date. To the contrary, the actual content of these three calls strongly suggests that Mr. Roberson was in fact highly unlikely to have joined in any such conspiracy.

Finally, even if the Court were inclined to hold Mr. Roberson responsible for *some offense* arising out of the event of December 6-7, 2019, the most severe offense that can plausibly be derived from that event is a conspiracy to commit an "aggravated assault"—not "murder." As the commentary to U.S.S.G. § 2A2.2 explains, an "aggravated assault" is defined as "a felonious assault that involved . . . a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon"). U.S.S.G. § 2A2.2, cmt. 1. While Mr. Roberson contends that even this standard is not satisfied by the evidence here, the sentencing guidelines

applicable to a conspiracy to commit "aggravated assault" are plainly more applicable to these facts than the "murder" guidelines cited in the PSR. If those guidelines were applied here, the base offense level for the events of December 6-7, 2019, would be, at most, **21**. *See* U.S.S.G. § 2X1.1 (a) (incorporating the base level offense from U.S.S.G. § 2A2.2 plus any adjustments from that guideline "for any intended offense conduct that can be established with reasonable certainty").[5] In addition, because any alleged conspiracy was arguably interrupted by the car accident, an event that was beyond the control of the alleged conspirators, it is possible that no further downward adjustments would apply. *See* U.S.S.G. § 2X1.1(b)(2).

A number of cases—in which the aggravated assault guidelines were applied to conduct far more egregious than that detailed in the PSR—also support the conclusion that the evidence in the PSR reflects, at most, Mr. Roberson's participation in alleged conspiracies to commit aggravated assaults, not murders. For example, in *United States v. Page*, 84 F.3d 38 (1996), the First Circuit concluded that the district court had properly applied the aggravated assault guideline to the following facts: the defendant and a co-defendant accosted several people outside a convenience store and yelled at them to "go back to Mexico where they belonged"; the co-defendant stuck a handgun to one of the victims' temples and threatened to "blow his head off"; and after the victims left the convenience store in a car, the defendant participated in a high-speed car chase, during which he "fir[ed] multiple gunshots at an occupied and moving vehicle" and struck one of the victims in the arm. *Id.* In *United States v. Roberts*, 162 F.3d 1170 (9th Cir.

---

[5] This calculation assumes *arguendo* that the Court concludes that it can be established "with reasonable certainty (a) that the planned aggravated assault on December 6-7, 2019, involved "more than minimal planning," and (b) that that the conspirators intended to discharge the firearm during the course of that offense. *See* U.S.S.G. § 2X1.1(a); *see also* U.S.S.G. §§ 2A2.2(b)(1), (b)(2). Mr. Roberson does not concede that there is sufficient evidence to establish either of these upward adjustments.

1998), the defendant went on a "violent rampage" during which he "threatened to kill [the victim] while attacking him." The district court concluded that the defendant had "intended to commit the felony of manslaughter" and therefore applied the aggravated assault guidelines, rather than the guidelines related to obstructing or impeding officers. *Id.* And in *United States v. Street*, 66 F.3d 969, 973–974 (8th Cir. 1995), the defendant berated and threatened park rangers with bodily harm, threatened to "kick the ass" of a state conservation agent, and ordered his son—who was armed with a deer rifle and placed it in a position to shoot—to kill the conservation agent if the agent sprayed the defendant with mace. *Compare United States v. Turnipseed*, 47 F.4th 608, 614-15 (7th Cir. 2022) (upholding use of "murder" guideline, rather than "aggravated assault" guideline, where defendant "took out a handgun and began firing at the rival gang member and victim "was shot four times," thereby establishing that defendant acted with "malice aforethought"). Notably, the facts of these cases all reflect conduct far more egregious than that described in the PSR, where Mr. Roberson was simply found to have been present in a car where guns were possessed. Accordingly, the Court should, at most, hold Mr. Roberson responsible for conspiracy to commit aggravated assault (although Mr. Roberson maintains that the evidence is insufficient to find him responsible even for that offense).

   2. *The Alleged "Attempted Murder" on May 11, 2022.*

   The PSR fares no better with its contention that Mr. Roberson should be held responsible for an attempted murder on May 11, 2022. *See* PSR ¶ 79; *see also* PSR p.47, Probation Officer's Response to Objections #12-14. The PSR's conclusion here is based entirely on a collection of surveillance videos from May 11, 2022, obtained from the Boston Housing Authority. *See* PSR ¶¶ 46-56. In short, those surveillance videos show an alleged Heath Street gang member, Deshawn Cerino, park a white scooter outside of 267 Centre Street, hand the scooter keys to three other individuals, after which those three leave on the scooter. *Id.* ¶¶ 46-49. Approximately

ten minutes later, two of the individuals who left on the scooter appear to shoot an individual ("J.F.") in the calf at the Mission Hill Development. *Id.* ¶ 52. The three individuals return to 267 Centre Street approximately 8 minutes later. *Id.* ¶ 55.

There is no dispute that Mr. Roberson's appearances in the surveillance videos cited in the PSR are limited.  He is seen in the hallway of 267 Centre Street shortly after Mr. Cerino arrives on the scooter, *id.* ¶ 46, and he is seen outside of 267 Centre Street shortly before the three individuals who were involved in the shooting return, *id.* ¶ 54.  He does not interact directly with Mr. Cirino or with any of the three individuals who allegedly committed the shooting. Rather, he is simply present at 267 Centre Street along with a number of other individuals before and after the shooting. *Id.*

Under Massachusetts law, the offense of attempted murder (assault with intent to murder in violation of G. L. c. 265 §15; or armed assault with intent to murder in violation of G. L. c. 265 §18(b)) requires evidence "that the perpetrator *possessed a specific intent to kill*" or that the perpetrator, while armed with a dangerous weapon, "*possessed a specific intent to cause the death of the person assaulted*." *Commonwealth v. Johnston*, 466 Mass. 555, 559-62 (2006) (emphases added); *Commonwealth v. Vick*, 454 Mass. 418, 428 (2009).  The offense further requires proof that the defendant committed an overt act in furtherance of the attempt. *See Commonwealth v. Hamel*, 52 Mass. App. Ct. 250, 256 (2001).

 Here, the evidence on the surveillance video does not support the proposition that Mr. Roberson should be held responsible for any attempted murder on May 11, 2022. There is simply no evidence that Mr. Roberson knew or should have known what Mr. Cirino or any of the three individuals directly involved in the shooting were planning to do that day.  Moreover, as the surveillance footage demonstrates, Mr. Roberson did not provide anyone with the means to

15

commit any shooting, he did not direct any of those individuals to engage in any conduct relating to the shooting, nor did he ever possess or distribute any weapons or other tools relating to that shooting. Most importantly, there is no evidence that he "possessed a specific intent to kill" or "possessed a specific intent to cause the death of the person assaulted." *Johnston*, 466 Mass. at 559–62. Under these circumstances, he cannot be deemed responsible for that shooting. *United States v. Ortiz*, 447 F.3d 28, 33 (2006) (a defendant's "mere presence" at scene of offense is insufficient to establish "knowing participation"); *see also United States v. Gadson*, 829 F. Supp. 435, 438-39 (D.D.C. 1993) (defendant's "mere presence" at scene of an offense is not enough to constitute responsibility for that offense as relevant conduct under the sentencing guidelines).[6]

Finally, and once again, even if the Court were inclined to hold Mr. Roberson responsible for *some offense* arising out of the events of May 11, 2022, the most severe offense that can plausibly be derived from that event is a conspiracy to commit an "aggravated assault"—not "murder." As the commentary to U.S.S.G. § 2A2.2 explains, an "aggravated assault" is defined as "a felonious assault that involved . . . a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon"). U.S.S.G. § 2A2.2, cmt. 1. While Mr. Roberson contends that even this standard is not satisfied by the specific facts here, the sentencing guidelines applicable to a conspiracy to commit "aggravated assault" guideline are likely more applicable to these facts than the "murder" guideline cited in the PSR.  If those guidelines were applied here, the base level offense for the events of December 6-7, 2019, would be, at most, **26**. *See* U.S.S.G. § 2X1.1 (a) (incorporating the base level offense from U.S.S.G. § 2A2.2 plus any

---

[6] Moreover, while the lack of evidence regarding Mr. Roberson's involvement in this event should end the matter, Mr. Roberson further notes that, given that the alleged victim was shot in the calf, *see* PSR ¶ 52, it is far from clear that the shooting at issue involved an "attempted murder" sufficient to support the PSR's application of U.S.S.G. § 2A1.5(a), as opposed to an aggravated assault governed by U.S.S.G. § 2A2.2.

adjustments from that guideline "for any intended offense conduct that can be established with reasonable certainty").[7]  Moreover, because all of the conduct relating to the alleged conspiracy was arguably completed on May 11, 2022, it is possible that no further downward adjustments would apply. *See* U.S.S.G. § 2X1.1(b)(2).

**B.    This Court Should Depart Downward Pursuant to U.S.S.G. § 5H1.1 Due to Mr. Roberson's Youthfulness at the Time of the Offense.**

The PSR also acknowledges that, in fashioning a sentence for Mr. Roberson, this Court may also consider a departure based upon Mr. Roberson's "youthfulness at the time of offense," as well as his "environment, adverse childhood experiences . . . lack of educational opportunities, and familial relationships." PSR ¶ 164 (citing U.S.S.G. § 5H1.1).

As this Court is aware, the Sentencing Commission recently amended the sentencing guidelines, and those amendments took effect November 1, 2024. In those amendments, the Commission expanded and emphasized U.S.S.G. § 5H1.1, stating that a downward departure "may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses," given that "[c]ertain risk factors may affect a youthful individual's development in the mid-'20s and contribute to involvement in criminal justice systems, including environmental, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships." The Commission also stated that "[y]outhful individuals generally are more impulsive, risk-seeking, and susceptible to outside influences as their brains continue to develop into young adulthood. Youthful individuals are more amenable to rehabilitation." This

---

[7] This calculation assumes that the Court concludes that it can be established "with reasonable certainty" (a) that the planned aggravated assault on May 11, 2022, involved "more than minimal planning," (b) that that the conspirators intended to discharge the firearm during the course of that offense, and that (c) the alleged victim of the shooting suffered a "serious bodily injury." *See* U.S.S.G. § 2X1.1(a); *see also* U.S.S.G. 2A2.2(b)(1), (b)(2), and (b)(3). Mr. Roberson does not concede that there is sufficient evidence to establish either of these upward adjustments.

amendment related to the Commission's statutory responsibility under 28 U.S.C. § 991(b)(1)(c) to establish and amend sentencing policies to reflect such advancement in knowledge of human behavior as it relates to the criminal justice system.

These factors are very much at play with regard to Mr. Roberson's personal history. Mr. Roberson is currently 24 years old and, at the time of the offense conduct, he was in his late teens and early twenties.  As noted above, Mr. Roberson has always lived in areas plagued by violence and drug trafficking and—apart from his friend, Mr. Brown, who was murdered when Mr. Roberson was sixteen—Mr. Roberson has largely lacked positive male role models throughout his life.

Moreover, not only does Mr. Roberson's youthfulness make his "more amenable to rehabilitation," he has in fact made rehabilitative progress since this birth of his son. As described above, prior to his arrest, Mr. Roberson had maintained consistent employment at Planet Fitness, where he was beloved by staff and members, and he has been an involved and loving parent to his young son. For that reason (and of course within the limits of to the terms of his plea agreement) this Court should also grant an additional downward departure under § 5H1.1 based on Mr. Roberson's personal history.

**C.**     <u>**A sentence of 60 months for Mr. Roberson is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.**</u>

Of course, this Court's determination regarding the sentencing range applicable to Mr. Roberson under the United States Sentencing Guidelines does not end its inquiry here. Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a)(2). The sentence must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the

18

public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Here, Mr. Roberson contends that a sentence of 60 months, at the low end of the agreed-upon sentencing range—and markedly above what Mr. Roberson contends is the applicable guideline range—together with three years of supervised release, is "sufficient, but not greater than necessary" to achieve the purposes of § 3553(a). Indeed, a 60-month sentence for Mr. Roberson would provide a lengthy punitive sanction that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. For the same reason, a 60-month sentence will also afford adequate deterrence.

The offense conduct in this case is, to be sure, serious. Mr. Roberson acknowledges his wrongdoing and has taken responsibility for his actions. Well before his arrest in this case, Mr. Roberson was working towards transforming his life and was gainfully employed at Planet Fitness, where he was a "dedicated employee" and "loyal friend" to his colleagues. Ex. H. And with a loving community of family and friends, he has the support that he needs to continue this positive trajectory following his incarceration. He has already taken steps to obtain his GED, and his remaining period of incarceration will be more than sufficient for him to take advantage of vocational and educational programs available within the Bureau of Prisons that will contribute to his rehabilitation.

In sum, a consideration of Mr. Roberson's personal history and circumstances suggests that a sentence of 60 months is reasonable and appropriate in this case. Moreover, a three-year term of supervised release with assistance from Probation and monitoring of his employment will ensure that Mr. Roberson can build on his rehabilitation.

## **CONCLUSION**

Mr. Roberson recognizes and acknowledges the seriousness of his offenses, and he understands and appreciates that his actions have adversely affected the community in which he lives. He has also seen the severe impact of his conduct on his family, particularly his young son. Given his relatively young age (24 years old), Mr. Roberson strongly believes that, with the assistance of the resources of the Bureau of Prisons during his period of incarceration and the Probation Office during his term of supervised release, he can rebuild his life a continue to be a productive member of society, a dedicated father, and a trusted and valued member of his family.

For all the foregoing reasons, as well as any additional reasons that may be advanced at the sentencing hearing in this matter, Mr. Roberson respectfully requests that this Court impose a sentence of 60 months of imprisonment to be followed by a three-year period of supervised release. Mr. Roberson further requests that, in light of his financial condition, the Court decline to impose any fine or restitution in this matter. *See* U.S.S.G. § 5E1.2(e).

Respectfully submitted,

KEYON ROBERSON
By his attorneys,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
dcloherty@clohertysteinberg.com
Alexandra Arnold (BB) #706208
aarnold@clohertysteinberg.com
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
617-481-0160

Dated: July 16, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing, on July 16, 2025.

/s/ *Daniel J. Cloherty*
Daniel J. Cloherty